UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JENNIFER HOOKMAN,

     Plaintiff,

           Case No. 2:15-cv-2318

    v.         CHIEF JUDGE EDMUND A. SARGUS, JR.
           Magistrate Judge Norah McCann King

AARON'S INC., and
TIFFANY IRVING,

     Defendants.

## OPINION AND ORDER

    This matter is before the Court on Defendants Aaron's Inc. and Tiffany Irving's Motion for Summary Judgment (ECF No. 29.) Plaintiff has filed a Memorandum in Opposition to Defendants' Motion for Summary Judgment (ECF No. 33.) Defendants have filed a Reply brief (ECF No. 37.) Defendants have also filed a Motion to Strike Demand for Jury Trial (ECF No. 36) and a Memorandum in Support of the Motion (ECF No. 36-1.) Plaintiff has filed a Brief in Opposition to Defendants' Motion to Strike Demand for Jury Trial (ECF No. 38), and Defendants have filed a Reply Brief (ECF No. 39.) For the reasons that follow, Defendants' Motion for Summary Judgment (ECF No. 29) is **GRANTED.** Defendants' Motion to Strike Demand for Jury Trial (ECF No. 36) is **DENIED as Moot.**

### I.  BACKGROUND

    Defendants Aaron's Inc. and Tiffany Irving removed this action from the Court of Common Pleas of Franklin County, Ohio, on the basis of diversity jurisdiction, pursuant to 28 U.S.C. §1332(a)(1). (ECF No. 1.) Plaintiff is a resident of the state of Ohio.  Defendant Aaron's Inc. is

incorporated in and has its principal place of business in the State of Georgia, and Defendant Irving is a resident of the State of Maryland. (*Id.*)

Plaintiff brings three claims, including (I) workers' compensation retaliation in contravention of O.R.C. § 4123.90; (II) disability discrimination in contravention of O.R.C. § 4112.01; and (III) intentional infliction of emotional distress. (Compl., ECF No. 3.) Essentially, Plaintiff claims that she was fired after being injured in a work-related automobile accident that necessitated pursuing medical treatment and applying for benefits under the Ohio Bureau of Workers' Compensation. (*Id.*) On the other hand, Defendants contend that "Plaintiff was issued a Corrective Action Form and terminated because she failed to correct the performance issues that were listed in her Final Written Warning." (Def.'s Mot., ECF No. 29-1, at 22.)

### A. Factual Background

Aaron's Inc. is one of the leading "rent-to-own" retailers in the United States (Irving Dec., ECF No. 38-18, at ¶ 4.) Aaron's, Inc. ("Aaron's") operates approximately 1,200 stores across the country. (*Id.*) The Northern Operations Division includes stores in Ohio, and a few stores in West Virginia and Kentucky. (*Id.* at ¶5.) From March, 2014, until Plaintiff's employment was terminated, Henri Rogers was the Vice President of Operations for the Northern Operations Division, and he was responsible for overseeing 114 stores. (Rogers Dep., ECF No. 30-13, at 7, 9, 11.)

Hookman became employed with Defendant Aaron's, Inc. on January 14, 2013 in their Associate Resources Department ("AR Department"), which "essentially is a human resources department." (Pl.'s Aff., ECF No. 33-1, at ¶¶ 4, 8.) When her employment began, Hookman received, read and understood the Policy Manual that was in effect when she was hired, and received, read and understood the Policy Manual that went into effect in 2014. (Pl. Dep., at 3, 31, 35-36.)

2

Among the policies contained in the Policy Manuals was Aaron's Rules of Conduct, which set forth the types of conduct that can lead to discipline. Among those offenses was "[f]ailure to adhere to Company performance standards, position responsibilities, or productivity standards," and Hookman affirms that she understood the Rules of Conduct. (Pl. Dep., at 43-44.)

Hookman was hired as a Recruiter (also referred to as a Talent Acquisition Partner, or "TAP") in the Northern Operations Division. (Pl.'s Aff., at ¶¶ 4, 12.) Her primary responsibilities included the following:

> …recruiting qualified applicants, ensuring company compliance and hiring guidelines were followed, directing recruit applicants, updating staffing charts and budget worksheets, attending open houses and other job opportunity events at the area stores, traveling and making site visits to the area stores, and ensuring that management teams were up to date with sourcing materials, screening tools and other aspects of the hiring/training processes….

(*Id.* at ¶ 13.)

A few months later, on April 8, 2013, Hookman was promoted to an Associate Resource Representative ("ARR") in the Northern Operations Division. (*Id.* at ¶15.) Her primary responsibilities in that position included the following:

> …ensuring that company policies (including hiring policies) were followed; communicating and coordinating the handling of associate issues and concerns to maintain a positive work environment; advising on associate resource matters; training and monitoring the completion of associate training; and ensuring proper administration of HR practices within Aaron's and its stores….

(*Id.* at ¶16.)

Hookman states that between April 8, 2013, and February 2014, she "worked in the ARR role without incident or issue, whether it be regarding my performance or behavior." (*Id.* at ¶17.) However, on February 10, 2014, Hookman received a written counseling statement setting forth

3

specific areas of conduct and demeanor that were found to be in violation of Aaron's Rules of Conduct. (*Id.* at ¶18.)  On May 12, 2014, Hookman transitioned back to the TAP position, and maintained that "Aaron's had no set plan on how to cover my ARR duties." (*Id.* at  ¶¶ 21, 22.) There is a dispute about whether Hookman's conduct during this time consisted of "stepping out of [her] lane." (*Id.* at ¶ 24.)  However, it is undisputed that, on July 2, 2014, Hookman received a second written counseling statement setting forth specific areas of conduct and demeanor that were found to be in violation of Aaron's Rules of Conduct. (*Id.* at ¶ 27.)  As a result of the second counseling statement, Hookman concedes that "Aaron's now claimed that [she] was on a 'final written warning.'" (*Id.* at ¶ 32.)

Hookman asserts that, as a result of conflicts with her supervisor, Hookman asked to be transferred to Defendant Irving's team. (*Id.* at ¶ 34.)  Plaintiff's request was granted, and "after returning from my leave of absence around August 31, 2014," she joined Defendant Irving's team. (*Id.* at ¶ 35.)  Hookman asserts that she was successful under Defendant Irving's supervision, "until my workplace injury in October, 2014." (*Id.* at ¶ 36.)  On October 8, 2014, Hookman was injured while driving her car in the course of her work. Hookman emailed Defendant Irving that night to advise her of the accident. (*Id.* at ¶¶ 43-45.) The following day, Hookman sought medical care related to her injuries, and filled out a Worker's Compensation claim form. (*Id.* at ¶¶ 48-49.) Hookman provided the Worker's Compensation paperwork to her supervisor, Defendant Irving, and kept her apprised of the status of her medical treatment, including restrictions on driving. (*Id.* at ¶¶ 51-52, 60.)

However, Hookman concedes that she missed a scheduled trip to Toledo scheduled from November 3rd through 7th, 2014. (Pl.'s Mem. Opp., ECF No 33, at 15.)  She asserts that she "still

4

met her Toledo goals by email and phone without visiting the store." (*Id.*) Hookman informed Defendant Irving of the missed store visit later in the week, when she remembered. (*Id.*) Hookman also had Dr. Bell's office submit an "updated MEDCO form with travel restrictions, retroactive for the entire week of November 3, 2014 through November 7, 2014." As such, Hookman felt "ensured that the matter was remedied and excused by her physician." (*Id.*) It is not disputed that Hookman's medical limitations were not communicated to her employer until after Hookman missed her days of scheduled travel.

The office management had "concerns" about how Ms. Hookman was communicating about "schedule changes or things like that . . . ." (Rogers Dep., at 94.) It is undisputed that, from October 17, 2014 until Hookman's termination, Ms. Jeffries, the assistant to Mr. Rogers, Aaron's executive managing the Northern Operations Division, was making "down-to-the-minute logs about where Hookman was at and what she was doing." (Pl.'s Mem. Opp., at 17.) Rogers concedes in his deposition that he is unaware that any such monitoring took place prior to October 17, 2014. (*Id.*) Plaintiff asserts that "Rogers then forwarded these spy reports to Defendant Irving around November 12, 2014." (*Id.*)

Hookman avers that she informed Defendants Irving and Aaron's about the "no traveling" restriction on November 7, 2014, and later that same day, Defendant Irving told her that there were four "alleged concerns regarding events" involving Hookman's workplace conduct, beginning on October 30, 2014. (Pl.'s Aff., at ¶¶ 61-68.) Three of these events concerned Hookman's interactions with other Aaron's employees. The fourth "concern" was the missed Toledo visit. (*Id.* at ¶¶ 64-77.) On November 11, 2014, Irving recommended that Hookman be terminated. (Irving Dep., ECF No. 30-10, at 105-108.) The recommendation was approved and Hookman was terminated three days

5

later on November 14, 2014. On November 13, 2014, Plaintiff submitted to Aaron's a medical form informing the employer that she could not travel for several weeks and would need physical therapy three times per week for the next four weeks. (Pl.'s Aff., at ¶83.)

"At the termination meeting, [Hookman] expressed then and there that [she] believed [her] termination was the direct result of, at least in part, [her] Worker's Compensation claim and Irving said that was not the case." (*Id.* at ¶ 85.) Hookman wrote on her termination notification form, stating "I believe this to be based in part because of my worker's compensation claim." (ECF No. 33-33, at 2.) Below Plaintiff's annotation, Defendant Irving wrote her own note: "Termination details are explained above. Decision was in no way impacted by a wc claim." (*Id.*)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). However, the Sixth Circuit has

explained that, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 257).

A genuine issue of material facts exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 486 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo Ass'n*, 328 F.3d 224, 234-35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

## III. ANALYSIS

### A.    Intentional Infliction of Emotional Distress

Defendants assert that Plaintiff Hookman's claim for intentional infliction of emotional distress is unavailing.  (Def.'s Mot., ECF No. 29-1, at 33.)  The Court concurs.  In recognizing the tort of intentional infliction of serious emotional distress, the Supreme Court of Ohio explained that the conduct at issue must be "extreme and outrageous."

> With respect to the requirement that the conduct alleged be "extreme and outrageous," we find comment *d* to Section 46 of the Restatement, *supra,* at 73, to be instructive in describing this standard:
>
> " * * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which

7

would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'. . . The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities."

*Yeager v. Local Union 20,* 6 Ohio St. 3d 369, 374-75, 453 N.E. 2d 666, 671 (1983), *abrogated on*

*other grounds, Wellington v. Weinfeld,* 113 Ohio St. 3d 464, 866 N.E. 2d 1051 (2007).

In *Godfredson v. Hess & Clark, Inc.,* 173 F.3d 365, 376 (6th Cir. 1999), the Sixth Circuit had

occasion to apply the holding of *Yeager* to an allegation of employment discrimination, and

explained that termination of employment, even on the alleged grounds of discrimination, would not

in itself be sufficient to support a claim of intentional infliction of emotional distress:

> Godfredson further claims that his discharge from Hess & Clark gives rise to a cause of action for the intentional infliction of emotional distress. The Ohio Supreme Court has held that a plaintiff may establish such a tort only if "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America,* 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (1983) (quoting RESTATEMENT (SECOND) OF TORTS § 46 (1965)).
>
> In support of this claim, Godfredson fails to allege any facts beyond those supporting his charge of discrimination under the ADEA. But an employee's termination, even if based upon discrimination, does not rise to the level of "extreme and outrageous conduct" without proof of something more. If such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress. *See Baab v. AMR Services Corp.,* 811 F.Supp. 1246, 1269 (N.D.Ohio 1993) ("[T]o say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement."); *Bryans v. English Nanny and Governess Sch., Inc.,* 117 Ohio App.3d 303, 690 N.E.2d 582, 592 (1996) (holding that even if the plaintiff-student proved her claim of discrimination on the basis of disability, the school's conduct was "not so extreme or outrageous as to be intolerable in a civilized community").

In an attempt to meet this high hurdle, Hookman asserts that Defendants' conduct was "deliberate and calculated misconduct against an employee engaged in protected activity under Ohio law." (Pl.'s Mem. Opp., at 52.)

Plaintiff asserts that the facts Hookman presents in support of her claim, taken in the light most favorable to her as the non-moving party, show that, "Aaron's, after learning about [her] car accident, injuries, and Worker's Compensation claim, took steps to (1) monitor her every-move between October 17, 2014 and her termination, and (2) fabricated 'concerns' about her work performance that could not even hold up against a simple rebuttal by Hookman, let alone the contradictory testimony from Andrews as to one of the events." (*Id.*) Although the Court does not diminish the nature of these allegations, as noted above, the Sixth Circuit has held that "an employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more." *Godfredson*, 173 F.3d at 376. Nor is Plaintiff able to supply any law to support her contention that evidence such as Plaintiff's constitutes "something more." Thus, Plaintiff's evidence is unavailing. Defendants' motion for summary judgment on Count III (Intentional Infliction of Emotional Distress) is **GRANTED**.

## B.      Disability Discrimination

Hookman brings her disability discrimination claim under O.R.C. § 4112.02, asserting that Defendants' termination of her employment was based on "Defendants' perception that Hookman was disabled." (Compl., ¶ 79.) Ohio courts generally follow federal law in analyzing disability discrimination claims. *See, e.g., Plant v. Morton Intern., Inc.*, 212 F.3d 929, 938-39 (6th Cir. 2000); *Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 573, 1998 Ohio 410, 697 N.E.2d 204

9

(1998) (noting that the ADA is similar to the Ohio law and looking to federal law in order to determine whether nearsightedness is a disability under O.R.C. § 4112).

Inasmuch as the alleged discriminatory acts at issue occurred after January 1, 2009, the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") applies in this case. *See* 42 U.S.C. § 12102, *et seq.*; *Milholland v. Sumner County Bd. of Educ.,* 569 F.3d 562, 566-67 (6th Cir. 2009). The ADAAA defines "disability" in subsection (1) as follows:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).

Subsection 3 further defines the meaning of "regarded as having such an impairment":

> For purposes of paragraph (1)(C):
>
> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
>
> (B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.[1]

42 U.S.C. § 12102(3).[2]

---

[1] The parties do not address the expected duration of Plaintiff's impairment.

[2] Under the ADAAA, a plaintiff proceeding under the ADAAA's "regarded as" prong only has to prove the existence of an impairment to be covered; she no longer has to prove that the employer regarded her impairment as substantially limiting a major life activity. See 29 C.F.R. § 1630.2(g)(3) ("the 'regarded as' prong of the definition of disability . . . does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment."). Similarly, the Ohio Civil Rights Act does not require an

10

### 1. *Prima Facie Case*

Plaintiff does not offer any direct evidence of discrimination, and therefore, to succeed on her claim, she must construct a circumstantial case, using the three-part protocol described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973) used in most other employment discrimination cases. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012), *see also Imwalle v. Reliance Med. Prods., Inc.* 515 F.3d 531, 544 (6th Cir. 2008) ("When a plaintiff presents only circumstantial evidence, we examine Title VII, ADEA, and Ohio state-law retaliation claims under the same *McDonnell Douglas/Burdine* evidentiary framework that is used to assess claims of discrimination."). Plaintiff asserts that, [t]o establish a prima facie case for perceived disability discrimination based on circumstantial evidence, a plaintiff must demonstrate that (1) her employer perceived her as disabled, (2) the employer took adverse employment action, at least in part, based on the perception that the employee is disabled, and (3) the employee can safely and substantially perform the job's essential functions, with or without reasonable accommodation." *See Hood v. Diamond Products, Inc.*, 74 Ohio St.3d 298, 302, 1996-Ohio-259, 658 N.E.2d 738 (1996). In *Hood*, the Ohio Supreme Court explained the burden shifting process:

> Once the plaintiff establishes a prima facie case of handicap discrimination, the burden then shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 197, 20 O.O.3d 200, 203, 421 N.E.2d 128, 132. Legitimate, nondiscriminatory reasons for the action taken by the employer may include, but are not limited to, insubordination on the part of the employee claiming discrimination, or the inability of the employee or prospective employee to safely and substantially perform, with reasonable accommodations, the essential functions of the job in question. *See, e.g.,* Ohio Adm.Code 4112–5–08(D)(4) and (E). Finally, if the employer establishes a nondiscriminatory reason for

individual alleging that her employer regarded her as disabled to show that the employer also believed that the perceived disability limits a major life activity. O.R.C. § 4112.01(A)(13).

the action taken, then the employee or prospective employee must demonstrate that the employer's stated reason was a pretext for impermissible discrimination. *Plumbers & Steamfitters Joint Apprenticeship Commt., supra,* 66 Ohio St.2d at 198, 20 O.O.3d at 203, 421 N.E.2d at 132.

*Hood*, 74 Ohio St.3d at 302. (Pl.'s Mem. Opp., at 34.)

Here, Plaintiff offers the following evidence to support the inference that Defendants perceived her to be disabled, and that this perception, at least in part, was causally connected to the termination. She asserts that the perception began after she was injured in a car accident on October 8, 2014, resulting in injuries to her neck. (Pl.'s Aff., at ¶¶ 44, 53.) She informed her supervisor, Defendant Irving, of the accident, and that she was receiving medical treatment for the injuries sustained in the accident. (*Id.* at ¶¶ 46, 48, 54.) Plaintiff submitted an injury report and worker's compensation claim documents to Defendant Irving. (*Id.* at ¶ 50.) She advised her doctor that she was "having trouble driving long distances from work" and he updated her MEDCO form to include a "no traveling restriction" for the week of November 3, 2014. On November 7, 2014, she informed her supervisor, Defendant Irving, about the "no traveling" restriction. (*Id.* at ¶ 55, 59-61). At the beginning of November, Plaintiff informed her supervisor, Defendant Irving, that the "no traveling" restriction would be in place "at least through November 24, 2014." (*Id.* at ¶ 82.) On November 13, 2014, Plaintiff informed her supervisor, Defendant Irving, that she had been to her first physical therapy appointment, and "the therapist told me that WC wants me to go three times per week for 12 visits." (*Id.* at ¶ 83.) On the following day, Plaintiff's supervisor, Defendant Irving, and another manager met with Plaintiff and terminated her employment "effective immediately." (*Id.* at ¶ 84.)

Defendant Irving denies that she perceived Plaintiff as disabled. (Irving Dec., at ¶ 28.) Defendants assert that Plaintiff "can present no evidence whatsoever that anyone at Aaron's thought

12

she was disabled." (Def.'s Reply, ECF No. 37, at 20.) However, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in her favor. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Inasmuch as Plaintiff's position as a TAP included "traveling and making site visits to the area stores," and inasmuch as her termination was implemented immediately upon the receipt of information about the length of time of the "travel restriction" and the need to attend numerous physical therapy sessions, there is sufficient evidence in the record, drawing all inferences in favor of the Plaintiff, to demonstrate to a reasonable juror that Aaron's regarded Plaintiff as disabled and took adverse employment action against her, at least in part, on the basis of a perceived disability.

Once a Plaintiff succeeds in establishing a prima facie case of discrimination or retaliation under the particular law, there is a presumption of discrimination or retaliation and the burden shifts to Defendants to articulate, but not ultimately prove, a legitimate, non-discriminatory reason for the decision to terminate Plaintiff's employment. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). If Defendants do so, the burden shifts back to Plaintiff to produce sufficient evidence to prove that the articulated reason is actually a pretext masking discrimination. *See Williams v. London Util. Comm'n*, 375 F.3d 424, 428 (6th Cir. 2004).

### 2. *Nondiscriminatory Reason for the Discharge*

Given that Hookman can establish a prima facie case of disability discrimination, the burden shifts to Defendants to articulate some legitimate, nondiscriminatory reason for its decision to fire Hookman. Defendants have offered such a reason: that Hookman was fired because her performance at work was unsatisfactory, "coming on the heels of prior discipline for the same types of behaviors." (Def.'s Mot., at 28.) Defendants rely on the deposition testimony and declaration of

13

Plaintiff's supervisor, Defendant Irving, to provide evidence of a legitimate, non-discriminatory reason for the decision to terminate Plaintiff's employment. In her declaration, Defendant Irving states:

> The only reasons that I terminated Ms. Hookman are for those set forth in the termination notice. A true and correct copy of the termination notice is attached hereto as Exhibit D. Had Ms. Hookman not received prior discipline for the same offenses in the past, in particular the final written warning issued by Ms. Colley, I would not have terminated Ms. Hookman's employment as a result of the investigation but would instead have tried to work with her to improve her performance. Ms. Hookman, however, had been given ample opportunity to correct these performance issues and I felt that the investigation showed that she had not done so and would not be able to regain the trust of management in the field.

(Irving Dec., at ¶25.)

> The reasons set forth in the termination notice are as follows:

> After being given multiple opportunities to correct her conduct and performance, on July 9, 2014, Jenna was issued a final written warning for violation of Rule of Conduct #2. The final warning outlined specific behavioral and performance issues Jenna was to correct (including but not limited to: refraining from involving herself in situations that do not involve Talent Acquisition, making wise decisions in her role, leading by example, and being above reproach, driving accountability, and being receptive to coaching and mentoring from operational partners and her management team). The final written warning also stated that if Jenna did not correct and maintain performance expectations, it would result in the termination of her employment. However, even after being provided additional mentoring, coaching, and direction, Jenna has failed to correct her conduct and performance and to meet expectations. Jenna has further demonstrated multiple instances of unprofessional conduct and management has continued to receive complaints about her. In addition, Jenna has failed to build effective business relationships with key Operational Leadership which has caused there to be a lack of confidence in Jenna's ability to perform her position responsibilities as a Talent Acquisition Partner. As a result, Jenna's employment with Aaron's, Inc. is being terminated effective immediately.

(*Id.*, at Exh. D.)

Thus, Defendants have met their burden to provide evidence of a legitimate, non-discriminatory reason for the termination. To defeat a summary judgment motion in these

14

circumstances, the "plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Braithewaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).

### 3. *Pretext*

Because Defendants have articulated a nondiscriminatory reason for firing Hookman, the burden of persuasion shifts back to Hookman to demonstrate that Defendants' proffered reason is a pretext for disability discrimination. *Johnson*, 215 F.3d at 573. "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and if so, how strong it is." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Id.* If the plaintiff has produced this evidence, summary judgment is inappropriate. *See Bennett v. Bd. of Educ. of Washington Cnty. Joint Vocational Sch. Dist.*, 785 F.Supp.2d 678, 688 (S.D. Ohio 2011).

Plaintiffs usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). Although these categories often provide "a convenient way of marshaling evidence," there is no requirement that a plaintiff's arguments fit neatly within one of the categories. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). Hookman's arguments focus on the second category.

### a.    Not the Actual Reason

Plaintiff's arguments purport to demonstrate that the four workplace "concerns" raised on November 7, 2014 by Defendant Irving, coupled with the two prior disciplinary warnings, were not the actual reason for her discharge.  When attempting to establish pretext under a "not the actual reason" argument, "'the plaintiff attempts to indict the credibility of [her] employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant.'"  *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 396 (6th Cir. 2008) (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). The plaintiff, in other words, "'argues that the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup.'"  *Id.* (quoting *Manzer*, 29 F.3d at 1084).

According to Hookman, pretext is circumstantially demonstrated in this case by (1) the "minute-to-minute" monitoring of her daily schedule that was implemented after her car accident and injuries, and (2) the "concerns" raised by Defendant Irving that only "came to light and were made known to Hookman after not only her car accident and injuries but also her communications with Aaron's about needed work restrictions associated with those injuries." (Pl.'s Mem. Opp., at 37.)

Defendants challenge the pretext argument.  After considering Defendants' challenges, the Court must determine whether a jury, viewing the entirety of Hookman's circumstantial evidence in the light most favorable to her, could reasonably doubt Defendant Aaron's and Defendant Irving's proffered nondiscriminatory explanation.

16

### i.     *Unsatisfactory Work Performance*

Defendants concentrate on their assertions that Plaintiff was terminated based on her unsatisfactory work performance. "The employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary decision process." *Tingle*, 692 F.3d at 531. The focus of the inquiry is "whether the employer made a reasonably informed and considered decision" before taking the complained of action. *Id.*    "When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Id.*

### *February 10, 2014 Warning*

Defendants concede that, "[g]enerally speaking, Plaintiff performed well during her first few months as a Recruiter. (Van Loon Dep., ECF No. 30-16, at 11-12)." (Def.'s Mot., at 5.) However, her manager at the time, Director of Associate Resources Beth Van Loon, testified at deposition that "[Hookman] tended to have difficulties with all of her managers. And what I mean by 'difficulties' is she tended to be very needy and tended . . . to have difficulty taking, you know, feedback . . . . She just kind of fought with them a lot." (Van Loon Dep. at 67-68; *see* Reinert Dec. at ¶9; Colley Dec.at ¶3.) Van Loon felt she did not have the time to adequately manage Hookman, and so she assigned Jill Reinert, a "seasoned" Associates Resources Manager, "to help oversee Plaintiff." (Pl. Dep. at 58; Van Loon Dep. at 16-17; Reinert Dec. at ¶2.) (Def. Mot., at 5.)

It is undisputed that in December, 2013, the AR Department received an anonymous letter claiming that, "during a meeting, Plaintiff had inappropriately disclosed information about an associate relations investigation, was not dressed appropriately and that she had acted as if she had punitive power over store associates that she did not possess." (Pl. Dep. at 60; Reinert Dec. at  ¶3.)

17

(Def.'s Mot., at 6.)    Reinert followed "standard protocol" in investigating the allegations and obtained a written statement from Plaintiff. (*Id.*)  As a result of the findings of the investigation, on February 10, 2014, Hookman received a written warning. (Pl. Dep. at 59-60.)  The written warning explained that Hookman was not meeting the expectations of an AR professional. (Pl. Dep. at 63.)  She was informed that she had violated Rule 2 of the Rules of Conduct by "[f]ailing to adhere to Company performance standards or position responsibilities."  Hookman admits that the written warning was justified, and not discriminatory or retaliatory. (Pl. Dep. at 61-63, 65, 110; Pl. Dep. Vol. 2, at. 269.)  Immediately after receiving this written warning, Hookman asked to be returned to the Recruiter position.  This request was granted. (Pl. Dep. at 68-71.)

### *July 2, 2014 Final Written Warning*

On May 12, 2014, Hookman returned to the Recruiter (TAP) position.  She initially reported to Erin Colley, who was one of two TAP managers. (Pl. Dep. at 58-59; Irving Dep. at 15-16; Colley Dec. at ¶ 3).  However, Defendants assert that within a couple of weeks, Hookman had performance issues that Colley had to address.  These included a failure to inform Colley of changes to her schedule, which was a requirement for the position. (Colley Dec. at ¶ 3; Rogers Dep. at 13-15, 17-18.)  As an example, Colley affirms that Hookman did not show up to a meeting where she was to facilitate and/or provide a portion of the training.  Colley affirms that she counseled Hookman. (Colley Dec. at ¶ 7.) (Def. Mot., at 8.)  As a result of several additional incidents, Colley issued Hookman a final written warning on July 2, 2014. (Pl. Dep. at 98.)  Hookman was found to have violated Aaron's Rules of Conduct by "failing to adhere to Company performance standards or position responsibilities as described in Rules of Conduct #2."  The warning stated, among other things:

This counseling form serves as final written warning and you must change the following behaviors:

> 1. Refrain from involving yourself in situations that do not involve Talent Acquisition.  You can still be a service provider to the field without involving yourself in every matter.

***

> 5. Jenna has had numerous complaints against her.  In conducting herself above reproach, these complaints should be significantly minimized going forward.

(Def.'s Mot., at 11.)

Additional complaints came in to Colley, including complaints from two former associates who did not work at Aaron's at the same time.  They contacted the Associate Resources office, complaining that Hookman was "incessantly viewing their LinkedIn accounts." (*Id.*, Pl. Dep. at 101, 103; Colley Dec. at ¶18.)  Colley advised Hookman to cease visiting their accounts. (*Id.*, Pl. Dep. at 100-102.)  Plaintiff testified that she felt that the complaints about viewing the LinkedIn accounts of former associates constituted Colley's attempt to "entrap her in a termination" and that now, Colley had a "bullet in the chamber." (Pl. Dep. at 108-109.)  Plaintiff made a complaint to James Cappola, the Director of Talent Acquisition, claiming that Colley was "engaged in workplace bullying" and requesting that the final written warning be vacated.  (*Id.*, Pl. Dep. at 103-104, 106-107, 124; Cappola Dep. at 8, 18-21.)  An investigator was assigned to investigate Hookman's complaint against Colley.  Ms. Adams, the Associate Resources Manager who investigated the complaint, met with Cappola, and the decision was made to uphold the final written warning. (Pl. Dep. at 112-115.)

Ultimately, Plaintiff took a leave of absence from July 11, 2014, through August 31, 2014, and

19

upon her return, she transferred to the team supervised by the other Talent Acquisition Manager, Tiffany Irving, as she had requested to do. (Pl. Dep. at 106, 116-117, 124-125.)

### *November 14, 2014 Termination*

Plaintiff asserts that, upon her transfer to Defendant Irving's team, "[d]uring the month of September, 2014, [she] had zero performance issues, and in fact, regularly received praise from Irving and other management personnel at Aaron's. (Pl. Aff. at ¶ 37.) "As of the end of September, 2014, [she] had been given no information leading me to believe that Aaron's had any issues with my performance or behavior." (*Id*. at ¶ 39.)  Then, on October 8, 2014, she was in the car accident while driving between stores, and informed Irving of the accident. (*Id*. at ¶¶ 44,45.)

However, Hookman confirms that, later in the month, on October 30, 2014, she was involved in an incident with a Customer Accounts Manager ("CAM"), and she texted his supervisor regarding the CAM's "shitty attitude." (*Id*. at ¶¶ 64-66.) A second incident occurred regarding a training appointment with General Manager Katie Duncan at one of the Aaron's stores, resulting in Duncan filing a complaint with Defendant Irving. (*Id*. at ¶¶ 71-73.)  A third incident also involved General Manager Duncan, regarding an alleged unscheduled walk-in interview that resulted in Duncan complaining to Irving or Reinert. (*Id*. at ¶¶ 75-76.) Then, on November 6, 2014, Hookman failed to show up at a scheduled visit to a store in Toledo.  "On the morning of November 7, 2014, Irving communicated to Hookman that there were four alleged events involving Hookman." (Pl.'s Mem. Opp., at 12.)  Later that day, Hookman provided Defendant Irving with "detailed written explanations for the four alleged incidents." (*Id*.)  As noted above, the first incident concerned her interaction with a Customer Accounts Manager; the second incident involved a disagreement with the General Manager of a store about whether Hookman was to conduct interviews or simply provide

20

training; the third incident involved another interaction with that same General Manager. (*Id.* at 14-15.) Plaintiff does not contest that the three "events" involving these managers occurred. Although she has responded to the characterization of these events, the fact of the complaints is uncontested. The fourth and final incident "specifically involved Hookman's travel schedule during the week of November 3, 2014 through November 7, 2014." (*Id.* at 15.) In this instance, she failed to travel as scheduled. Only on November 7, 2014 did she submit a medical justification for missing the trip.

The primary pretext argument that Defendants must address is the fact that, starting on October 17, 2014, after Plaintiff had her car accident, the assistant to the Division Vice President began to document Hookman's comings and goings. Division Vice President Rogers explained that there was no system for Hookman to "punch in and punch out from a specific hourly time, but keeping track of the schedule . . . I think I did communicate to Tiffany [Irving] or Erin [Reinert] that we do keep a weekly schedule in the office and the talent acquisition partner would submit a schedule to their supervisor also." (Rogers Dep. at 90-91.) Rogers also had ongoing discussions with Hookman about "scheduling needs [and] requests from the field." (*Id.* at 22-23.) Rogers was involved with Hookman in her role as TAP in discussing the scheduling needs of the Division and in determining where they needed to allocate resources, including holding job fairs, open houses, etc. (*Id.* at 14.) Roger's testified that his general guideline was that, if an individual had a schedule change, the individual was to notify him. (*Id.* at 15.) If an individual changed his or her schedule without advising him, Rogers generally asked a member of his staff to follow up with the associate to notify him or her that they needed to update their schedule. (*Id.* at 17.)

Defendant Irving testified that from the time that she began supervising Hookman, she believed that Rogers had trust issues with Hookman. "He would never outright say he didn't trust

21

her, but he would ask a lot of questions about her schedule, which I would not get from other DVPs about their TAP, talent acquisition partner." (Irving Dep. at 51.) As a result of these concerns, Roger's assistant began documenting Hookman's comings and goings, with the first notations dated on October 17, 2014. (Rogers Dep. at 86.)[3]

Rogers testified at his deposition that for "six months or whatever, four months that [Hookman] was with me, I was communicating with her supervisors" and he told Defendant Irving that "he would keep her up-to-date with some of my concerns, and these are some of the emails I sent to her." (*Id.* at p. 87) Rogers testified that he did not ask his assistant to monitor "specifically down to the minute" but "more of anything outside of the norm." (*Id.* at 89.) According to Rogers, "[e]specially I've had this ongoing concern and issue that I communicated to a couple of her supervisors, to Jenna's supervisors, and it seemed to be progressively getting worse. So at this point, you know, I was concerned and I did talk to Tiffany and I did let Tiffany know my concern." (*Id.*) As an example, Rogers noted that "a four-hour lunch break would be outside the norm." (*Id.*) Rogers agreed that the notations began on October 17, 2014. (*Id.* at p. 95.)

Then on November 6, Hookman failed to travel to Toledo for a scheduled store visit. Hookman neglected to tell Irving and Rogers of the change in her schedule until the morning of November 6, which she admits was "a mistake." (Pl. Dep. at 161, 188-189.) On November 7, Hookman was also scheduled to be at stores in Toledo and again failed to travel there. (Irving Dep. at 61-62.) Rogers contacted Defendant Irving and asked why Hookman was not in Toledo as scheduled. (Irving Dep. at 61-61; Rogers Dep. at 25-26, 33-34.) Irving then contacted Hookman,

---

[3] For example, one email notes Hookman left for lunch at 1:00. "[S]he is taking her computer with her because she might be doing field recruiting later, she doesn't know." (Rogers Dep. at p. 88.)

who indicated for the first time that she had obtained a travel restriction from the doctor. (Irving Dep. at 94-95.) Irving asked Plaintiff to provide a statement regarding why she did not travel to Toledo, and to also provide statements regarding the other three complaints that Defendant Irving had received from field managers about Plaintiff over the past two weeks. (Irving Dec. at ¶ 19.)

Hookman explained that she had a doctor's appointment on November 6, and forgot to tell her supervisors about the schedule change. (*Id.*) Regarding this issue, Hookman went back to Dr. Bell and asked him to instate a retroactive "no travel" instruction back-dated to November 3, 2014, in order to cover the dates that she failed to notify the office of a schedule change. Dr. Bell complied. The following week, on November 12, 2014, Rogers forwarded several emails to Irving that focused on Hookman's schedule, starting on October 17, 2014. (Rogers Dep. at 86.) Rogers testified that he conveyed his concerns to Hookman's supervisor, Irving, and his "primary conversation with Ms. Irving at that point was in regard to scheduling." (*Id.* at 58.) Rogers testified that he did not participate in the decision to terminate Hookman, and he was informed of her termination after the fact. (*Id.* at 67.)

Hookman contends that the Defendants fired her on November 14, 2014 in retaliation for the information she gave them the day earlier, indicating a need for physical therapy and travel restrictions. The undisputed testimony from Irving, however, is that the decision to terminate was made on November 11, 2014, prior to the information being received. Thus, without more, no inference of pretext can be drawn.

In *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742 (1993), the Supreme Court stated that "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." As the Sixth Circuit has

23

explained, "[i]f an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision (*i.e.* the adverse action), then the employee will not be able to establish pretext." *Majewski v. Automatic Data Processing, Inc.* 274 F.3d 1106, 1117 (6th Cir. 2001). Viewing all of the circumstantial evidence outlined in this section as a whole, and in the light most favorable to Hookman, the Court is convinced that a jury could not reasonably doubt Defendants' proffered nondiscriminatory explanation concerning the investigation and disciplinary decision process. Plaintiff's effort to prove pretext is unavailing. Defendants' motion for summary judgment on Count II (Disability Discrimination) is **GRANTED.**

### C.      Worker's Compensation Retaliation

Hookman's claim of worker's compensation retaliation is brought under O.R.C. § 4123.90, which provides, in relevant part:

> No employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the worker's compensation act for an injury or occupational disease with occurred in the course of and arising out of his employment with that employer. . . .

As in her disability discrimination claim in Paragraph III. B. above, Plaintiff does not offer any direct evidence of retaliation. Therefore, to succeed on her claim, she must construct a circumstantial case, and the claim is evaluated pursuant to the *McDonnell Douglas* burden-shifting framework employed in Paragraph III. B. above. *See Sharp v. Waste Management, Inc.*, 47 F.Supp.3d 584, 599 (S.D. Ohio 2014).

To establish a prima facie case of worker's compensation retaliation, a plaintiff must present evidence that the employee: "(1) was injured on the job; (2) filed a worker's compensation claim;

and (3) the employee suffered an adverse employment action in contravention of O.R.C. § 4123.90." *Sharp*, 47 F.Supp.3d at 596.

Plaintiff argues that the temporal proximity between filing the worker's compensation claim and the adverse employment action "alone may be significant enough to constitute evidence of a causal connection." (Pl.'s Mem. Opp. at 27.) However, "a case alleging unlawful retaliation is not a vehicle for litigating the accuracy of the employer's grounds for termination. Instead, the employee also must offer some evidence that not only were the employer's reasons false, but that retaliation was the real reason for the adverse action." *Sharp*, 47 F.Supp.3d at 602 (citing *Tingle*, 692 F.3d at 530). Therefore, assuming *arguendo* that Plaintiff can establish a prima facie case, the analysis is the same for her worker's compensation retaliation claim as for her disability discrimination claim above.

Here, Defendants have denied any retaliatory motive, and therefore the focus is on the "pretext" element. Again, the ultimate inquiry is "did the employer fire the employee for the stated reason or not?" "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional [retaliation]." *Tingle*, 692 F.3d at 530, citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir 2009). Additionally, the Court in *Tingle* explained that "[a]n employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact." *Tingle*, 692 F.3d at 531, citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012).

Through the depositions, exhibits, and declarations filed in this case, Defendants have offered sufficient evidence to establish that management honestly believed they had disciplinary reasons for the termination of Hookman's employment. "A plaintiff facing a summary judgment motion cannot

25

'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Tingle*, 692 F.3d at 533, citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (the Cir. 1989).  Relying on the analysis performed in Paragraph III B. above, the Court finds that Hookman has not been able to provide evidence that could lead a reasonable jury to find that the Defendants' proffered reasons for terminating her employment are a pretext for worker's compensation retaliation.  Accordingly, Defendants' motion for summary judgment on Count I (Worker's Compensation Retaliation) is **GRANTED.**

## IV.  CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment (ECF No. 29) is **GRANTED.**  Defendants' Motion to Strike Demand for Jury Trial (ECF No. 36) is **DENIED as MOOT**.


IT IS SO ORDERED.

3 - 27 - 2017
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**